Filed 10/15/14  P. v. Wilson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>SIDNEY DAVID EUGENE WILSON,<br><br>      Defendant and Appellant. | A138469<br><br>(Solano County<br>Super. Ct. No. FCR287453) |

Defendant Sidney David Eugene Wilson was convicted of second degree murder of his girlfriend.  He contends the trial court erred in allowing improper cross examination of his character witnesses and admitting into evidence a letter containing hearsay.  We affirm.

## I.  BACKGROUND

In a complaint filed September 12, 2011, defendant was charged with murder (Pen. Code,[1] § 187, subd. (a)), possession of a firearm by a felon (§ 12021, subd. (a)(1)), and possession of ammunition (§ 12316, subd. (b)(1)).  In connection with the murder charge, the complaint alleged an enhancement for personal use of a firearm.  (§ 12022.53, subd. (d).)  Defendant pleaded no contest to the weapons possession charges and proceeded to trial on the charge of murder and the firearm use enhancement.

It is undisputed defendant shot his long-time girlfriend, Victoria C., on September 8, 2011.  The issue at trial was the degree of the homicide.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

The primary witness to the shooting was Victoria's daughter, A.C. A.C. said she and Victoria had lived in the same home as defendant for about six years. During that time, Victoria and defendant had often argued. On the day of the incident, they argued on the telephone and later in the evening when riding in the car. After arriving home from the drive, Victoria went into the bedroom to change her clothes, while defendant went to the garage. At some point, defendant said to Victoria, "Would you come out to the garage real quick?" and "I need to talk to you." A.C. found the request unusual in two ways. First, she noticed that defendant's voice was "really, really calm." Second, the two did not normally go to the garage when they needed to discuss things. Victoria responded, "I'll come out if you just calm down." After defendant promised he "just want[ed] to talk," they left for the garage.

Approximately five minutes later, Victoria screamed for A.C. On the way to the garage, A.C. heard "something outside [the house] that sounded loud." On reflection, she decided it was a gunshot. When she appeared in the door of the garage, the pair was facing each other, "fighting and arguing." Defendant was holding a gun. Victoria was holding a cell phone in one hand and the back of her neck with the other. Seeing A.C., Victoria told her to "Call 911." Before A.C. left, defendant appeared to load the gun and then shot Victoria, and she collapsed to the ground. He turned and told A.C., "Go in the house." A.C. did as she was told, but she retreated to a point in the house from which she could see into the garage. A.C. saw her mother lying on the ground, with defendant "just walking around her." After A.C. left the window to safeguard her younger siblings, she heard another gunshot. In total, defendant fired four shots over a period of more than two minutes. Victoria died of multiple gunshot wounds to the head.

Defendant admitted he and Victoria were sometimes violent toward one another. On the day of the shooting, he argued with her over the phone. He later told a coworker he was "going to kick [Victoria's] ass." That evening, defendant left his loaded gun on a table in the garage, although that was not his normal practice. In the course of the evening, he drank two six-inch bottles of vodka. During the argument in the garage, defendant said, he accused Victoria of infidelity, and she admitted to having an affair.

2

Victoria started clapping her hands and said, "You are not going to do shit about it." Defendant found it difficult to remember what happened next, but he remembered shooting at Victoria multiple times.

Defendant called his grandmother, aunt, and brother as character witnesses to his nonviolent nature and the loving, although sometimes tempestuous, nature of his relationship with Victoria. During cross-examination, the prosecutor confronted defendant's grandmother and aunt with questions about four separate, specific incidents of violence allegedly directed by defendant at Victoria during arguments between the two of them. The questions were based on police reports and eyewitness accounts by A.C. Each time, the prosecutor asked whether the witness was "aware" of the incident and, following a description of the incident, whether hearing about the incident changed the witness's mind about defendant's nonviolent nature. Defendant did not object to the form of the questions, although he did object that the prosecutor did not have a good faith basis to believe the incidents occurred.

When cross-examining defendant, the prosecutor suggested defendant had been having an affair himself. When defendant denied an affair, the prosecutor questioned him about a woman named Shauna. When defendant testified he "[hadn't] seen her in six, seven, eight years," the prosecutor presented him with a letter from Shauna dated April 26, 2011, a few months before the shooting.

The letter reads, in relevant part: " 'I am writing to let you know that I love you and I miss you so much! I am constantly thinking about you in the morning, day, night and in my dreams. I hate the fact that we are always so far apart from each other but now you are always in my heart and my thoughts. I can't wait to see you again. I want to feel your arms wrapped around me hugging me tightly never letting me go and your lips kissing me. You are the one and only man for me. You are my soulmate. You complete me. You are my rock and my night (*sic*) and shining a (*sic*). You mean everything to me. I know soon we will be together, like we should be. I hope that I'm not 100 though.' "

At the conclusion of defendant's testimony, the prosecutor moved Shauna's letter into evidence.  Defense counsel objected on grounds of hearsay and undue prejudice under Evidence Code section 352.  The court offered to give a limited purpose instruction, which defense counsel accepted.  The court instructed the jury as follows: "[T]he people had requested that the Court receive People's Exhibit 31.  It's a letter containing a card and some photographs.  I have now received People's Exhibit 31 into evidence, but I'm doing so for a limited purpose. [¶] When I indicated it's for a limited purpose, it's not for the truth of the statements contained within the card by a person who is not present in this courtroom and testified."

## II.  DISCUSSION

Defendant contends the trial court erred in allowing the prosecutor to ask the character witnesses (1) if they were "aware of" the incidents during which defendant allegedly used violence and (2) whether such information would change their opinion regarding his character.  In addition, he contends the letter from Shauna was improperly admitted hearsay.

### A.  *Cross-examination of Character Witnesses*

Under Evidence Code section 1102, a criminal defendant may offer evidence "in the form of an opinion or evidence of his reputation" in order to demonstrate that his or her character is inconsistent with commission of the charged crime.  Thereafter, "the prosecution may cross-examine a defense character witness about acts inconsistent with the witness's testimony as long as the prosecution has a good faith belief that such acts actually occurred."[2]  (*People v. Kennedy* (2005) 36 Cal.4th 595, 634, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 458–459.)  In *People v. Marsh* (1962) 58 Cal.2d 732 (*Marsh*), the Supreme Court held that a character witness testifying about the defendant's reputation cannot be asked whether he or she knows of

---

[2] Defendant does not challenge the prosecutor's good faith in asking about the incidents.

4

past inconsistent conduct by the defendant, but only whether he or she has "heard" of the conduct. (*Id.* at p. 745.)

Relying on *Marsh*, defendant contends the prosecutor's questions were improper because she asked whether the character witnesses were "aware" of his conduct, rather than whether they had "heard" of it. As *Marsh* makes clear, however, its ruling that "do you know" questions are improper concerned witnesses testifying to the defendant's reputation.[3] (*Marsh, supra*, 58 Cal.2d at pp. 745–746.) The court was not confronted with, and did not purport to rule on, the proper form of similar questions directed at a witness testifying to his or her personal opinion of the defendant's character.

In *People v. Lopez* (2005) 129 Cal.App.4th 1508, the court found questions in the form "do you know" to be proper when posed to a personal opinion character witness. (*Id.* at p. 1528.) As the court held, "Defendant asserts that the prosecutor should have asked about what [the opinion character witness] had heard, not about what she knew. [Citations.] [¶] We understand the rule invoked by defendant to be limited to reputation witnesses. When a witness offers an opinion of a defendant's good character, it is often based on personal knowledge as well as reputation. [Citation.] This opens the door for the prosecutor to offer rebuttal evidence of defendant's character. [Citation.]. . . The prosecutor can test the witness's opinion by asking about his or her knowledge of the defendant's misconduct [citation], even if the witness professes ignorance." (*Ibid.*) Other California decisions have permitted cross-examination of opinion character witnesses about their awareness of prior inconsistent conduct without challenging the form of the question (*People v. Hinton* (2006) 37 Cal.4th 839, 901–902) and have suggested this form is proper. (*People v. Hempstead* (1983) 148 Cal.App.3d 949, 954; see also *People v. Clair* (1992) 2 Cal.4th 629, 684 [approving of the reasoning of *Hempstead*].) The distinction is also recognized by a leading commentator on the law of evidence. (See 1 McCormick, Evidence (7th ed. 2013) Character & Habit, § 191,

---

[3] The other cases cited by defendant, primarily *People v. Neal* (1948) 85 Cal.App.2d 765, 769–771 and *People v. McDaniel* (1943) 59 Cal.App.2d 672, 676–677, also concern reputation witnesses.

pp. 1064–1065.)  Because defendant's character witnesses had testified about his character from personal opinion, the prosecutor's phrasing on cross-examination about the witnesses' awareness of specific acts was proper.

Defendant's argument to the contrary, which resolutely fails to address, or even acknowledge, the significance of the distinction between reputation and opinion character evidence, provides no basis for departing from the generally accepted rule.

Defendant also contends the prosecutor's follow-up questions, which asked if knowledge of the alleged violent acts of defendant would have changed the witnesses' opinions about his character, were improper.  Such questions were disapproved by the Supreme Court in *People v. Weber* (1906) 149 Cal. 325, 343.  However, the court later permitted the questions in *People v. McKenna* (1938) 11 Cal.2d 327, 335–336 (*McKenna*), creating what a later decision referred to as "a divergence of opinion" (*People v. Boone* (1954) 126 Cal.App.2d 746, 751 (*Boone*)).  The latest word on the controversy, which we follow, comes from *People v. Malloy* (1962) 199 Cal.App.2d 219 (*Malloy*), which held:  "Witkin in his work on California Evidence [citation] notes that this type of question 'seems objectionable as calling for an *opinion* on *hypothetical facts* instead of testing the witness' knowledge of the defendant's actual reputation' [citations]. . . . [¶] We feel bound in this case, as we did in [*Boone*], to hold the ["change your opinion"] questions proper on the authority of [*McKenna*].  We repeat our language from *Boone* (p. 751):  'But in [*McKenna*], the appellant complained that "the trial judge allowed the district attorney in cross-examining the defendant's character witnesses to ask them whether their opinion of her reputation for truth, honesty and integrity in the community in which she lives would be changed if they heard her character questioned because of certain acts done or statements made by her" (p. 335) and the reviewing court held that the trial court "properly allowed the questions asked by the district attorney" (p. 336). [¶] 'The *McKenna* case, a decision of the Supreme Court, is of course, controlling.' "  (*Id.* at pp. 228–229.)

6

Again, defendant's argument, which fails to cite *McKenna* or acknowledge the split in authority, provides no basis for departing from the authority of *McKenna* and *Malloy*.

**B. *Hearsay Evidence***

Defendant contends the trial court erred in admitting the letter because it contained hearsay statements. The Attorney General argues the letter was not hearsay because "the trial court expressly instructed the jury that the postcard contained in People's Exhibit 31 was not to be considered for the truth of the statements contained there." While the trial court's admission of the letter was error, we conclude the error was harmless.

Notwithstanding the hearsay rule, statements of a declarant reflecting his or her state of mind may be admitted to prove the declarant's state of mind "when it is itself an issue in the action." (Evid. Code, § 1250, subd. (a)(1).) As explained in *People v. Noguera* (1992) 4 Cal.4th 599, for such a statement to be admitted under Evidence Code section 1250, subdivision (a)(1), the declarant's state of mind must be at issue in the action; the statements may not be admitted if their only relevance is to prove conduct of the defendant that might be inferred from the declarant's state of mind. (*Noguera*, at pp. 621–622.) Because Shauna's purported affection for defendant was wholly irrelevant to the action other than its implications for defendant's conduct, her letter was not properly admitted under subdivision (a)(1).

The Attorney General argues admission was proper under a limiting instruction, but the court's limiting instruction did not cure the error. While the instruction told the jury what the evidence could *not* be used to prove—the matters asserted—it failed to tell the jury what the evidence *could* be used to prove. Most likely, the court intended to inform the jury the statements could only be used as proof of Shauna's state of mind, consistent with Evidence Code section 1250, subdivision (a)(1). Yet this would have created a paradox. The only matter asserted by the statements was Shauna's state of mind. If they could not be used to prove the truth of the matters asserted, they had no probative purpose. If, on the other hand, the court intended to permit their admission for some other purpose, the only possibility was as proof of defendant's affair, a purpose not

7

permitted under the hearsay exception provided by section 1250. It was error to admit the letter, with or without a limiting instruction.

Nonetheless, we conclude that admission of the letter was harmless under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. Whether defendant had an affair with Shauna had little or no bearing on the only disputed issue at trial, the nature of his state of mind at the time of the killing. Because defendant testified, the jury was able personally to evaluate the credibility of his explanation of the circumstances of the killing, as well as his association with Shauna. The evidence supporting the jury's judgment of second degree murder was strong. The prosecution's theory, even if supported, that defendant's own affair would have mitigated his anger at Victoria upon hearing she had an affair was weak, at best. Moreover, the letter did not claim that an affair was occurring; it was simply evidence that Shauna had a crush on defendant. Under these circumstances, admission of the letter is not likely to have materially influenced the jury's conclusion with respect to defendant's guilt.

While we doubt admission of the letter violated the Sixth Amendment as construed in *Crawford v. Washington* (2004) 541 U.S. 36, since the statements were not "testimonial" as used there (*id.* at pp. 61–62), we find also admission of the letter harmless under the constitutional standard of *Chapman v. California* (1967) 386 U.S. 18.

## C. *Cumulative Error*

Because the only error we find is the admission of the hearsay statements in the letter, which we have concluded was harmless, there is no basis for a claim of cumulative error.

## III. DISPOSITION

The judgment is affirmed.

8

_____
Margulies, J.

We concur:


_____
Humes, P.J.


_____
Dondero, J.

9